**WO**

MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Richard Johnson,

Plaintiff,

v.

David Shinn, et al.,

Defendants.

No.  CV-21-02083-PHX-MTL (ESW)

**ORDER**

Plaintiff Richard Johnson, who is currently confined in the Arizona State Prison Complex (ASPC)-Lewis, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Defendant Thornell moves for summary judgment.  (Doc. 68.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 70), and he opposes the Motion.  (Doc. 76.)

**I.    Background**

In his Complaint, Plaintiff states that he is Native American and alleges that societies, including Warrior Societies, "play[] an integral part of Plaintiff's Native Ways/Religious Beliefs."  (Doc. 1 at 8.)  Plaintiff alleges that ADCRR's designation of Warrior Society Security Threat Group ("STG") places a substantial burden on Native Americans, discriminates against Native Americans "based upon race and religious belief/Native Ways," and "inhibits and constrains . . . Plaintiff's[] ability to express [his] Native Ways/Religious Belief."  (*Id*. at 9-12.)  Plaintiff alleges he has been validated as a Warrior Society member, without having committed any disciplinary infractions.  As a

result, Plaintiff has been placed in maximum custody confinement, where he has less access to rehabilitation programs, no access to "sacred items/religious items," and cannot use a sweat lodge.  (*Id*. at 9.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment religious exercise and Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims for injunctive relief against Defendant David Shinn, former Director of the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR"), in his official capacity, and directed Shinn to answer the claims.[1]  (Doc. 6.) The Court dismissed the remaining Defendant.  (*Id.*)

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

---

[1] Shinn has since left ADCRR, and current ADCRR Director Ryan Thornell, in his official capacity, was automatically substituted for Shinn pursuant to Federal Rule of Civil Procedure 25(d).  (Docs. 62, 63.)

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.   Relevant Facts[2]

### A.   ADCRR's Prison Gang Policies

Within the ADCRR, prisoners have formed gangs and other groups that engage in unlawful behavior or present a threat to the safe and secure operation of the ADCRR or the public. (Doc. 69 (Def.'s Statement of Facts) ¶ 1.) ADCRR categorizes such groups as Security Threat Groups (STGs). (*Id.* ¶ 2.) In 1991, ADCRR established an STG Unit dedicated to controlling prison gang activity because gangs were fighting each other and amongst themselves, selling drugs, extorting payments from other prisoners, and ordering assaults and killings in prison. (*Id.* ¶ 3.) By identifying and isolating STG members, ADCRR has been able to reduce prison gang membership and activities, contributing to a decrease in violence, intimidation, and harassment of other prisoners. (*Id.* ¶ 4.)

ADCRR's STG policy is set forth in Department Order ("DO") 806 and provides for the identification and certification of prison gangs, the identification and validation of prisoner STG members, the continual monitoring of STG activities, the re-classification of validated prisoners, the debriefing and segregation of renounced prisoners, and a step-down program for validated prisoners who participate in programming and are not involved in gang activity or major disciplinary violations for two years. (*Id.* ¶ 5.)

The ADCRR defines an STG generally as any organization, club, association, or

---

[2] The relevant facts are undisputed unless the Court notes otherwise.

group of individuals, including traditional prison gangs, whose members engage in unlawful acts or acts that violate ADCRR's policies and detract from prison safety and order.  (*Id.* ¶ 8.)  Under DO 806, a club, association, organization, or gang may be certified as an STG if it either meets the statutory requirements for criminal street gang or terrorism found in chapter 13 of the Arizona Revised Statutes or there is evidence demonstrating "a clear and compelling potential to threaten the safe and secure operation of the Department or any members or sections of the public."  (*Id.* ¶ 9.)

ADCRR has certified the following STGs: Aryan Brotherhood (1995); New Mexican Mafia (1996); Old Mexican Mafia (1996); Border Brothers (1997); Grandel (1997); Mau Mau (1998); Surenos (2000); Warrior Society (2001); Diné Pride (2009); and West Side City Crips (2019).  (*Id.* ¶ 12.)  Since the STG policy began, the Department has decertified the Old Mexican Mafia, Grandel, and Mau Mau STGS.  (*Id.* ¶ 15.)[3]

ADCRR may designate a prisoner an STG suspect based on information from other criminal justice agencies, interviews at ADCRR Reception Centers, and reports from staff; once a prisoner is identified as a suspect, Special Security Unit ("SSU") staff open a suspect file and begin gathering information through telephone monitoring, mail scans, incident reports and other information related to STG activity.  (*Id.* ¶¶ 26-27.)  When there is sufficient evidence in a prisoner's suspect file to meet validation criteria, SSU staff prepare a validation packet.  (*Id.* ¶ 28.)  To be validated as an STG member, a prisoner must accrue three or more of the following criteria specific to the STG: self-admission; tattoos; symbolism; documents; publications; authorship; court records; group photos; association; contacts; membership documents; other agency information; and media.  (*Id.* ¶ 30.)

Under prior versions of DO 806, every validated STG member who refused to renounce was assigned a maximum custody level and was sent to the ASPC–Eyman, Browning Unit, which was established to provide maximum custody and control or safety

---

[3] Plaintiff asserts that he cannot say whether he disputes Defendant's paragraph 15 because STG intelligence is "confidential at all times" and "on a need-to-know basis only." (Doc. 76 ¶ 15.)  Plaintiff states that no notification has ever been issued to prisoners about the decertification of Old Mexican Mafia, Grandel, or the Mau Mau.  (*Id.*)

of certain inmates.  (*Id.* ¶¶ 38-39.)  Validated STG prisoners only became eligible for a custody reduction and to leave the Browning Unit if the prisoner renounced his STG membership and satisfactorily debriefed, which included a successful polygraph, or successfully completed the STG Step-Down Program.  (*Id.* ¶ 40.)  The Step-Down Program allows a prisoner to demonstrate he is no longer involved in an STG but does not require the prisoner to renounce and debrief, to admit to being an STG member, or to provide information about the STG.  (*Id.* ¶ 41.)

Under the current DO 806, a validated STG member in the Browning Unit may be eligible for a reduction in custody level in one of four ways: (1) renouncing STG membership; (2) satisfactorily completing the STG Step-Down Program; (3) not participating in any documented STG activity for 24 months as provided in DO 801 (ADCRR's classification policy) and completing the incentive steps outlined in DO 812 (ADCRR's maximum custody management policy); or (4) qualifying for a custody reduction as provided by DO 801 and after consultation with the STG Unit.  (*Id.* ¶ 42.) According to Defendant, the current STG policy was modified and became effective on April 15, 2021, and a prisoner now remains at the same custody and classification level upon being validated. (*Id.* ¶ 43.)  Plaintiff disputes this fact, asserting that under the current policy, a validated member of an STG is assessed 16 points, which, depending on his point score, can require him to be placed in a higher custody level.  (Doc. 76 ¶ 43.)

In determining a prisoner's housing, ADCRR looks at various factors set forth in DO 801, including the prisoner's disciplinary history, the prisoner's most serious current and prior offense, escapes or escape attempts, history of violence, gang affiliation, age, and participation in social programming.  (Doc. 69 ¶¶ 44-45.)  There are five custody levels based on a prisoner's likelihood of escape or committing violence.  (*Id.* ¶ 46.)  Maximum custody represents the highest risk to public and staff and requires frequent monitoring and controlled movement within the facility.  (*Id.* ¶ 47.)

**B.    Warrior Society STG**

Defendant asserts that the Warrior Society has been a source of violent incidents in

the prison since 1982, when a fight broke out between Native American prisoners, all of whom had Warrior Society tattoos, and black prisoners on a prison athletic field.  (*Id.* ¶ 16.)  Plaintiff responds there is no evidence to support that the fight was for or in furtherance of an STG, and Defendant does not explain or show these Warrior Society tattoos that all of them had.  (Doc. 76 ¶ 16.)

Defendant asserts that the Warrior Society has and continues to engage in drug trafficking, extortion, assaults, and other disturbances, both in prison and outside of prison. (Doc. 69 ¶ 17.) Plaintiff disputes this, saying there is no evidence to support that these actions in and outside of prison "are in furtherance of, or for, an STG." (Doc. 76 ¶ 17.)

Defendant asserts that suspected Warrior Society members have been involved in such criminal matters as the 2010 murder of prisoner Albert Tsosi, a suspected member of Diné Pride STG, and that Plaintiff was involved in this matter; the July 2020 homicide of Joseph Toki, a Warrior Society member, during the robbery of a service station in Scottsdale, Arizona; and the ongoing crimes committed on the Gila River Indian Community investigated by FBI Safe Trails.  (Doc. 69 ¶ 18.)  Plaintiff disputes this, asserting that he was stabbed in the chest in 2010, and, although he was charged with murder in Maricopa County Superior Court case CR2011-005346-002 DT, the court found "the State has failed to demonstrate . . . evidence that [Plaintiff] is a member of or affiliated with the Warrior Society."  (Doc. 76 ¶ 18.)  Plaintiff further asserts there is no evidence to support that the homicide of Joseph Toki was for, or in furtherance of, an STG, and Plaintiff states he does not have sufficient information about the bases of or the type of alleged crimes Safe Trails is purportedly investigating.  (*Id.*)

### C.   ADCRR Religious Practice Policies

Prisoner religious activities are governed by DO 904, and all prisoners are permitted to possess a medallion consistent with their designated religious preference.  (Doc. 69 ¶¶ 54, 57.)  Prisoners who designate a Native American religious preference are permitted to possess additional items used in religious practice such as bandanas, beaded necklaces, corn husks, corn pollens, various herbs, eagle feathers, and smudging shells.  (*Id.* ¶ 58.)

1    Except for eagle feathers, which require a valid permit from the U.S. Fish and Wildlife

2    Service, the Chaplaincy approves the possession of such items for Native American

3    prisoners who are tribally enrolled in a federally recognized tribe.  (*Id.* ¶ 59.)  Native

4    American prisoners may possess these additional items by requesting them in a personally

5    signed inmate letter.  (*Id.* ¶ 60.)  ADCRR allows Native American prisoners to hold sweat

6    lodges, talking circles, pow wows, and dances, and they may engage in other group

7    religious practices if a request is submitted at least 20 days in advance; permission is

8    required for all religious celebrations.  (*Id.* ¶¶ 61-63.)

9         Browning Unit prisoners are generally allowed to possess religious items and

10   participate in religious activities to the same extent as other prisoners except for activities

11   that present a security risk, such as the sweat lodge, which Browning Unit prisoners may

12   not participate in.  (*Id.* ¶¶ 64-65.)

13        Sweat lodges are considered sacred grounds, and, according to Defendant, ADCRR

14   staff are not permitted inside without the permission of the shift commander who must first

15   notify a warden or deputy warden and the chaplain.  (*Id.* ¶ 66.)  Plaintiff disputes that

16   ADCRR staff must seek such approval and asserts that, at a townhall meeting in October

17   2022 at ASPC-Winslow, Captain Young told him that his officers "can search the sweat

18   lodge grounds without permission from administration."  (Doc. 76 ¶ 66.)

19        Defendant asserts that sweat lodge gatherings can and have been used to exchange

20   STG information and orders and for making and concealing weapons.  (Doc. 69 ¶ 67.)

21   Defendant further asserts that Browning Unit prisoners cannot keep some items in their

22   cells, such as smudging shells, which could be used as weapons, or herbs, the burning of

23   which would violate Browning Unit's designation as a non-smoking facility, and these

24   items are stored in the housing unit sergeant's office and are available for use during

25   recreation.  (*Id.* ¶¶ 68-69.)  Plaintiff disputes that these restrictions are needed because,

26   based on his personal experience, "no such actions [have] ever been performed at sweat

27   lodges" and to his knowledge, there has not been an incident of a Native American using

28   their smudging shell as a weapon.  (Doc. 76 ¶¶ 67-68.)

As an alternative to sweat lodges, Native American prisoners in maximum custody can participate in talking circles during recreation time with any other Native Americans. (Doc. 69 ¶ 70.)   Plaintiff disputes that this is a viable alternative, stating that this "alternative celebration" is a way for SSU officers to validate Native Americans as STG members pursuant to DO 802 which says evidence relating to validation includes photos of a prisoner with two or more validated or suspected STG members or reports documenting "observed association of the inmate with STG . . . members." (Doc. 76 ¶ 70.)

Defendant asserts that Browning Unit prisoners are permitted to smudge during recreation time, but Plaintiff responds that he has been denied smudging by officers due to his STG status in maximum security going back to 2019 and as recently as 2023. (Doc. 69 ¶ 71; Doc. 76 ¶ 71.)

Prisoners may participate in any observance in their own cells unless it affects the operation of the institution, in which case the prisoner must request in writing the accommodation they seek. (Doc. 69 ¶ 72.)  In addition, Defendant asserts that prisoners can fast, pray, meditate, engage in self-study, and order religious texts. (*Id.* ¶ 73.)  Plaintiff disputes this because any self-study or texts relative to the Warrior Society will be denied because the Warrior Society is designated an STG. (Doc. 76 ¶ 73.)

### D. Plaintiff's Designation as a Warrior Society Member

Plaintiff entered ADCRR custody in 2000, was released to community supervision in 2002, and returned to ADCRR custody in 2003 to serve a 12-year sentence. (Doc. 69 ¶¶ 74-75.)  In 2004, Plaintiff severely assaulted a correctional officer and was sentenced in 2006 to an additional 8.5 years in prison and was given a suspended sentence for assaulting 3 other officers while at the Maricopa County Jail earlier in 2006. (*Id.* ¶¶ 76, 78-79.)

Defendant asserts that Plaintiff was suspected of being a Warrior Society member on May 20, 2010, when his name was found on an STG "hit list" targeting members of the Warrior Society, and Plaintiff was connected to the June 2010 murder of Albert Tsosie, a suspected member of Diné Pride. (*Id.* ¶ ¶ 80-81.)  Plaintiff disputes this, asserting that Maricopa County Superior Court records state that prison officials "failed to demonstrate

by the evidence that [Plaintiff] is a member of or affiliated with [an STG]." (Doc. 76 ¶ 80, citing Trial Minute Entry Day Three (Aug. 13, 2012) in *State of Ariz. v. Richard Johnson*, Maricopa County Superior Court Case No. CR2011-005346-002 DT.)   Plaintiff further asserts that in a 2013 district court case, the Court found that "the record shows that Plaintiff [is] not an STG member." (*Id.*, citing Doc. 161 at 8 in *Johnson v. Juvera*, No. 2:12-cv-00538-GMS (DKD) (D. Ariz. 2013).)

Plaintiff also asserts insofar as Defendant characterizes the murder of Albert Tsosie as gang/STG related, the Superior Court "ruled otherwise." (*Id.* ¶ 81, citing Trial Minute Entry Day Three (Aug. 13, 2012) in *State of Ariz. v. Richard Johnson*, Maricopa County Superior Court Case No. CR2011-005346-002 DT.)   Plaintiff and Defendant dispute whether Plaintiff was holding Tsosie's arms or hand while another prisoner, Marlon McCowan, stabbed Tsosie with a metal shank. (Doc. 69 ¶ 82; Doc. 76 ¶ 82.)   Plaintiff asserts that because Tsosie had a weapon in his hand, Plaintiff was holding Tsosie's hand so he (Plaintiff) would not be stabbed. (Doc. 76 ¶ 82.)   In 2012, Plaintiff pleaded guilty to solicitation to commit second-degree murder in Tsosie's death and was sentenced to an additional five years in prison. (Doc. 69 ¶ 85.)

Defendant asserts that ADCRR later determined McCowan to be a suspected member of the Warrior Society based on a review of documents going back to 2003, but Plaintiff responds he cannot say whether he disputes this statement because STG documents are confidential. (Doc. 69 ¶ 83; Doc. 76 ¶ 83.)

In October 2014, Plaintiff was validated as a STG Warrior Society member due to his possession of a roll call of Warrior Society and Diné Pride members housed at Central Unit, a micro note he authored discussing Warrior Society business, including a debt to be collected, a letter from another Warrior Society member discussing Warrior Society business, and a letter from an influential Warrior Society member introducing himself. (Doc. 69 ¶ 86.)   In November 2014, after the STG Appeal Committee upheld the decision of his first validation hearing, Plaintiff was transferred to the Browning Unit. (*Id.* ¶ 89.)

Plaintiff was in the Step-Down Program in 2017 and transferred to close custody (a

less restrictive facility), but while he was in close custody, officers found three STG-specific documents in Plaintiff's belongings: a calendar code specific to the Warrior Society with the name and number of another validated Warrior Society prisoner; a roster of Warrior Society members; and a micro-note from a Diné Pride STG member to another containing a Diné Pride roster and describing Diné Pride activities.  (Doc. 69 ¶¶ 90-92.)  Plaintiff was terminated from the Step-Down Program on April 23, 2018, and returned to maximum custody at the Browning Unit on April 30, 2018.  (*Id.* ¶ 93.)  Plaintiff had two validation re-hearings in March and September 2020, and both hearings confirmed Plaintiff as a member of the STG Warrior Society, and he remains a validated STG member.  (*Id.* ¶ 94.)  Plaintiff disputes this evidence, asserting that he was terminated from the Step-Down Program "due in part to retaliatory motives by prison officials."  (Doc. 76 ¶ 92.)

In July 2022, Plaintiff was transferred to the ASPC-Winslow facility following a classification review that determined he could be held in a less restrictive setting.  (Doc. 69 ¶ 95.)  On January 23, 2023, staff discovered a homemade handcuff key in Plaintiff's property, and an SSU investigation found that Plaintiff was involved in facilitating the assault of another prisoner.  (*Id.* ¶¶ 96-97.)  Plaintiff denies possessing the handcuff key or facilitating the assault of another prisoner, and he asserts that no disciplinary ticket was ever issued for facilitating an assault.  (Doc. 76 ¶¶ 96-97.)  Plaintiff was charged with possession of the homemade handcuff key, found guilty, and his conviction was upheld on appeal February 17, 2023.  (Doc. 69 ¶ 98.)  As a result, a discretionary override was issued, and Plaintiff was returned to maximum custody at the Browning Unit.  (*Id.* ¶ 99.)  Plaintiff's appeal of the override decision was upheld on May 12, 2023.  (*Id.* ¶ 100.)  Plaintiff's disciplinary record includes threatening another person with harm, several assaults, fighting, and the murder of Tsosie.  (*Id.* ¶ 101.)  Plaintiff disputes that he was returned to maximum custody as a result of the handcuff key, asserting that the discretionary override was because of STG activity for "sanctioning" an assault, and he notes that his reclassification on June 21, 2023, states that he "has had no STG activity for the past 24 months" and could be managed at a lower custody yard.  (Doc. 76 ¶ 99.)

Plaintiff asserts that due to his STG status, he has been classified to Browning Unit for almost a decade, even though his current classification points are low enough to allow him on a lower, medium security unit.  (*Id.* ¶ 115.)

### E.     Plaintiff's Religious Designation

As of December 20, 2006, Plaintiff's designated religious preference has been Native American.  (Doc. 69 ¶ 102.)  Defendant asserts that Plaintiff was raised in the traditional Native American religion, but Plaintiff believes that religion is a European concept imposed on Native Americans and that religion for him is just how he was brought up, a way of life, involving traditional beliefs and stories, including creation stories.  (*Id.* ¶¶ 103-04.)  Plaintiff disputes Defendant's characterization of "Native American religion," but will use the term to refer to his "theological doctrine/dogma."  (Doc. 76 ¶¶ 103-04.)

Defendant quotes Plaintiff's description at his deposition of the Warrior Society as a dogma "which is just looking out and helping those that cannot help themselves and helping make sure that our traditional beliefs doesn't fade away with time, and carrying on our traditional beliefs, traditional values, and the stories that were taught to us as younger [sic] through verbal communication."  (Doc. 69 ¶ 105.)  Plaintiff does not dispute this quotation but asserts that Defendant's fact "is an oversimplification of his hour-plus-long deposition." (Doc. 76 ¶ 105.)  Plaintiff became a member of the Warrior Society when he began believing in this dogma.  (Doc. 69 ¶ 106.)

The Warrior Society has members and elders, but Defendant says Plaintiff "does not know or understand of any organization of the Warrior Society, holidays, or training," and he also "does not know of any tenets, beliefs, or practices that are different from traditional Native American tenets, beliefs, or practices."  (Doc. 69 ¶ 107.)  Plaintiff disputes this, asserting that Defendants seems to approach Plaintiff's system of religious belief in the same way as "mainstream" religious perspective, even though the Supreme Court has recognized there are many religions in this country and that "[r]eligious experiences which are as real as life to some may be incomprehensible to others."  (Doc. 76 ¶ 107, quoting *United States v. Ballard*, 322 U.S. 78, 86 (1944).)

1   In July 2021, while at the Browning Unit, Plaintiff requested permission to possess
2   certain herbs, but the Complex Senior Chaplain rejected and returned his inmate letter
3   because it was not signed.  (Doc. 69 ¶ 109.)  There is no documentation that Plaintiff signed
4   and returned his letter or submitted a new, signed letter.  (*Id.* ¶ 110.)  Plaintiff does not
5   recall his inmate letter being returned to him.  (Doc. 76 ¶¶ 109-110.)

6   On July 11, 2022, following his transfer to close custody, Plaintiff requested to be
7   on the turn out to attend Talking Circle, Sweat Lodge, and all religious activities, and he
8   was added to the Talking Circle and Sweat Lodge turnouts on August 11, 2022.  (Doc. 69
9   ¶¶ 111-112.)

10   If a Native American prisoner who is a validated STG member requests a religious
11   celebration or activity that is not a Native American celebration or activity already
12   recognized by ADCRR, the Department will accommodate the request to the extent
13   possible considering the safety and security of others and the orderly operations of the
14   prison.  (*Id.* ¶ 113.)  It is ADCRR's policy to accommodate all requests for religious
15   practices or celebrations to the extent possible because it promotes harmony and is to
16   everyone's advantage.  (*Id.* ¶ 114.)

17   Plaintiff asserts that Defendant refuses to recognize the Warrior Society as a
18   "religious movement coming out of a religious community in response to religious
19   questions." (Doc. 76 ¶ 116.)  Plaintiff asserts that the practice of his beliefs is substantially
20   burdened by the ADCRR's refusal to recognize the Warrior Society "as exercises of Native
21   Ways/Religious Beliefs that may or may not be compelled by, or central to, a system of
22   religious belief to Native Americans." (*Id.* ¶ 127.)  Plaintiff states that the Warrior Society
23   "is not the primary denomination of Native Ways/Religious Beliefs but is just part of a
24   system of religious beliefs to Native Americans." (*Id.* ¶ 152.)  "Plaintiff's belief occupies
25   a place in his life parallel to that filled by the orthodox belief in God." (*Id.* ¶ 155.)

26   Plaintiff states that because the Warrior Society is designated an STG, there is a
27   complete ban on Warrior Society literature in the ADCRR under DO 914, Inmate Mail,

28

1   section 7.0, Unauthorized Content, which prohibits STG publications, documents, or

2   articles indicating STG membership or activity.  (*Id.* ¶ 131.)

3           Due to Plaintiff's STG validation, his religious items have been destroyed,

4   specifically, a bandana.  (*Id.* ¶ 135.)  Due to Plaintiff's STG validation, he is prohibited

5   from attending religious services, and Chaplain Venalonzo said in a response to Plaintiff's

6   grievance that "Browning Unit is a maximum security unit, and does not have any religious

7   service[s] . . . ."  (*Id.* ¶¶ 140-141 (alteration and ellipsis in original).)  Plaintiff has had

8   difficulty obtaining the proper accommodations for smoke-generating ceremonies (i.e.,

9   burning sage, cedar, sweetgrass, tobacco, and other sacred herbs), and although DO 904

10  provides that Browning Unit prisoners are allowed to conduct smoke-generating

11  ceremonies during their regularly scheduled exercise times in an approved exercise area,

12  officers do not have time to escort Plaintiff to an approved exercise area.  (*Id.* ¶¶ 142, 144.)

13  **IV.     Religious Exercise Legal Standards**

14      **A.     First Amendment**

15          "Inmates retain the protections afforded by the First Amendment, 'including its

16  directive that no law shall prohibit the free exercise of religion.'"  *Shakur v. Schriro*, 514

17  F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

18  (1987).  To implicate the Free Exercise Clause, a prisoner must show that the belief at

19  issue is both "sincerely held" and "rooted in religious belief."  *Malik v. Brown*, 16 F.3d

20  330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d 884-85 (noting the Supreme Court's

21  disapproval of the centrality test and finding that the sincerity test in *Malik* determines

22  whether the Free Exercise Clause applies).

23          If the prisoner makes this initial showing, the prisoner must then establish that

24  prison officials substantially burdened the religious practice by preventing the prisoner

25  from engaging in conduct which the prisoner sincerely believes is consistent with his or

26  her faith.  *Shakur*, 514 F.3d at 884-85.  A regulation that burdens the First Amendment

27  right to free exercise may be upheld only if it is reasonably related to a legitimate

28  penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987).  This determination requires

analysis of four prongs: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to prisoners; (3) the impact accommodation of the right will have on guards and other prisoners, and on the allocation of prison resources; and (4) the absence of ready alternatives. *Id.* at 90.

## B.   RLUIPA

Under RLUIPA, a government may not impose a substantial burden on the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2); *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

RLUIPA requires a prisoner to show that the relevant exercise of religion is grounded in a sincerely held religious belief. *Holt v. Hobbs*, 135 S. Ct. 853, 859, 862 (2015). Next, the prisoner bears the burden of establishing that a prison policy constitutes a substantial burden on that exercise of religion. *Id.*; *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). RLUIPA provides greater protection than the First Amendment's alternative means test. *Holt*, 135 S. Ct. at 862.

If the prisoner satisfies these two showings, the burden shifts to the government to prove that the substantial burden on the prisoner's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Warsoldier*, 418 F.3d at 995.

## V.   Discussion

### A.   Plaintiff's Claims and Requested Relief

Plaintiff alleges that ADCRR's designation of the Warrior Society as an STG places a substantial burden on Native Americans, discriminates against them "based upon race and religious belief/Native Ways," and "inhibits and constrains . . . Plaintiff's[] ability to express [his] Native Ways/Religious Belief." (Doc. 1 at 9-12.) Plaintiff's requested relief in this action is to have the Warrior Society decertified as an STG; to promptly place Plaintiff and other prisoners who are validated as Warrior Society members back in general

population status and classified to the "appropriate" custody level; to expunge all records indicating any sort of Warrior Society STG activity; and to take "any additional steps necessary to prevent these illegal acts from re-occurring." (*Id.* at 16.)

To the extent Plaintiff is seeking relief on behalf of other Native American prisoners, a non-attorney may not appear on behalf of another person. *See C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987) (while a non-attorney may represent himself, he has no authority to appear as an attorney for others); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (plain error to permit a prisoner proceeding pro se to represent fellow prisoners in a class action); *McShane v. United States*, 366 F.2d 286, 288 (9th Cir. 1966) (non-lawyer had no authority to appear as an attorney for other persons in a purported class action); *accord Smith v. Schwarzenegger*, 393 Fed. App'x 518, 519 (9th Cir. 2010) ("The district court correctly held that [a California state prisoner] could not bring a class action, or otherwise appear on behalf of other inmates."). Plaintiff does not allege, nor does it otherwise appear, that he is an attorney licensed to practice in Arizona. For that reason, he may not present claims on behalf of other prisoners.

In addition, although Plaintiff alleges that he has been validated as a Warrior Society member "without having committed any disciplinary infractions," Plaintiff does not challenge the process by which he was validated as an STG member, and such a claim would not fall under the First Amendment or RLUIPA.[4]

Also, while Plaintiff alleges that ADCRR's designation of the Warrior Society as an STG places a substantial burden on Native Americans, the designation of the Warrior Society as an STG is not a claim in this action. As Magistrate Judge Willett observed in an earlier Order denying Plaintiff's request for an order requiring Defendant to produce evidence of why ADCRR has classified the Warrior as an STG:

---

[4] Plaintiff did present a Fourteenth Amendment challenge to the ADCRR's annual review process of his maximum custody placement because of his STG validation in *Johnson v. Ryan*, and the Ninth Circuit Court of Appeals affirmed the Court's dismissal of that claim. *See Johnson v. Ryan*, 55 F.4th 1167, 1188-89 (9th Cir. 2022).

1
2
3
4
5
6
7
8
9
10
11

> At issue in this case is whether Plaintiff's rights under the First Amendment and RLUIPA have been violated. (Doc. 6 at 3). Resolution of these claims will not require the Court to analyze the reasons why the Arizona Department of Corrections has classified the Warrior Society as a STG. *Jonas v. Schriro*, No. 04-2719-PHX-SMM, 2006 WL 2772641, at *1 (D. Ariz. Sept. 25, 2006) (resolving inmate's claims asserting violations of the First Amendment and RLUIPA premised on the prison's classification of the Warrior Society as a STG, which allegedly eliminated the inmate's ability to practice his religion and traditions of his Native American beliefs, without analyzing reasons why the Warrior Society was designated as a STG). The Court finds that the information requested in Plaintiff's Request for Production No. 3 is not relevant or proportional to the needs of the case. Plaintiff's Motion to Compel (Doc. 40) will be denied.

12

(Doc. 44 at 5.)

13
14
15
16
17
18
19
20

To the extent Plaintiff claims the Warrior Society is a religion and thus designating the Warrior Society as an STG violates his religious rights, such a claim lacks merit because there is no evidence that ADCRR's use of the name "Warrior Society" for a specific STG within ADCRR is at all religiously based as opposed to a response to the actions of individuals within a group that threaten prison operations. While Plaintiff cites numerous treatises and articles about the role of warrior societies in Native American culture, there is no evidence that ADCRR's use of this same term to denote an STG has anything to do with traditional warrior societies or their religious practices.

21
22
23

Plaintiff's allegations in this action relate to his access to religious services, religious practices, and religious items while in maximum custody as a validated STG member, and the Court will limit its analysis to whether these religious rights have been violated.

24

**B.    The Merits**

25
26
27
28

Defendant argues that assuming the Warrior Society is a religion, Plaintiff has not identified any Warrior Society practice or exercise of his religion that differs in any way from the practice or exercise of the Native American religion that he identified as his faith and that ADCRR already seeks to accommodate. (Doc. 68 at 9.) Defendant argues that

"[g]iven Plaintiff's view of the Warrior Society—that it is a dogma for protecting traditional Native American beliefs with a benevolent code of conduct—the issue devolves into whether the designation of the Warrior Society as an STG or his validation as a Warrior Society member creates a substantial burden on his exercise or observance of Native American religious practices."[5]  (*Id*.)

Defendant appears to concede that Plaintiff's religious exercise is grounded in a sincerely held religious belief and not some other motivation.  Thus, the Court's analysis will focus on whether Defendant has substantially burdened Plaintiff's religious exercise and, if so, whether the burden is reasonably related to a legitimate penological interest under the First Amendment and furthers a compelling government interest under RLUIPA.

Under the First Amendment, a substantial burden exists "where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981).  In the RLUIPA context, a substantial burden is one that is "'oppressive' to a 'significantly great' extent.  That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."  *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). To substantially burden the practice of an individual's religion, the interference must be more than an isolated incident or short-term occurrence.  *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998).

Defendant argues that when a Native American prisoner is transferred to maximum custody, the only significant impact on his ability to practice and observe his religion is the loss of the right to attend a sweat lodge, and ADCRR does not prevent maximum custody

---

[5] Defendant argues that the Warrior Society, at least as Plaintiff describes it, would not likely meet the definition of a religion or at least one that is separate from the Native American religion that ADCRR already recognizes. (Doc. 68 at 15.) Whether the Warrior Society is a religion separate from the Native American religion already recognized by ADCRR is not before the Court, and the Court need not address Defendant's argument that Plaintiff has not identified the religious characteristics of the Warrior Society.

prisoners from smudging, dancing, or partaking in other ceremonies during recreation times.  (Doc. 68 at 9.)

Plaintiff responds that the validation of the Warrior Society as an STG means there is a substantial burden on his religious exercise because there is a complete ban on Warrior Society literature, his religious property has been destroyed, he is prohibited from assembling with others for religious services, and he is prohibited from smoke-generating ceremonies.[6]  (Doc. 76 at 15.)

### 1.    Warrior Society Literature

Plaintiff asserts that by designating the Warrior Society an STG, there is a "complete ban" on "Warrior Society literature" because DO 914 prohibits STG publications, documents, or articles indicating STG membership or activity. (Doc. 76 ¶ 131.) Plaintiff has not identified any material that is effectively banned by ADCRR or that have been used by ADCRR to validate him or any other prisoner as belonging to an STG. As such, Plaintiff's evidence is vague and conclusory and insufficient to create a genuine issue of material fact that ADCRR substantially burdens his access to religious texts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."); *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact").

On this record, the facts do not support a finding, under either the First Amendment or RLUIPA, that Defendant has substantially burdened Plaintiff's ability to receive "Warrior Society literature."  Accordingly, the Court will grant summary judgment to Defendant on the issue of Warrior Society Literature.

---

[6] The Court assumes that smoke-generating ceremonies are synonymous with smudging ceremonies, but that is not entirely clear.

1

### 2.      Religious Property

2      Plaintiff asserts that his religious items have been destroyed due to his validation as

3   an STG member.  (Doc. 76 at 7.)  He presents an Informal Complaint dated February 17,

4   2023, in which he said he did not receive all his property after he was transferred to the

5   Browning Unit, including two of his six bandanas, even though DO 704 allows six

6   bandanas.[7]  (Doc. 76 at 126.)  Sergeant Marquez responded that "I have reviewed your

7   contraband and all other items were altered, excess or not allowed at max custody unit and

8   will not be issued to you."  (*Id*. at 125.)  Plaintiff filed a formal Grievance and said he only

9   received four bandanas when DO 904 allows six bandanas.  (*Id*. at 124.)  The response says

10  the bandana issue needs to be addressed on a separate complaint because it concerns

11  religious property.  (*Id*. at 123.)  Plaintiff filed a Grievance Appeal, and the response says

12  DO 904 permits a maximum of six paisley print style bandanas that must be pre-approved

13  by Chaplaincy Services, but Plaintiff's profile shows he was denied a request to purchase

14  three paisley bandanas on July 27, 2021 because he did not sign or date the form that was

15  submitted to the Chaplain, and there were no authorized religious purchase requests

16  electronically filed in ACIS at that time.  (*Id*. at 120.)  In a separate Grievance about the

17  lack of religious services and property in Browning Unit, Plaintiff said he was told two of

18  his bandanas depicted gang symbols and would be destroyed, which Plaintiff said was

19  outrageous because one bandana has Native designs and the other "is a sacred significance

20  to Pimas."  (Doc. 76 at 81.)  The response to this Grievance says the seized bandanas do

21  not meet the color/pattern requirement of policy and neither has been approved for

22  purchase by a chaplain.  (*Id*. at 79.)

23      Plaintiff apparently has four bandanas to use for religious purposes, and he presents

24  no evidence how the lack of the maximum six bandanas allowed under the policy

25  substantially burdens his religious practice.  On this record, the facts do not support a

26  finding, under either the First Amendment or RLUIPA, that Defendant has substantially

27

28      [7] Plaintiff did not mention any other religious property in this Informal Complaint
    which also complained about not receiving all his legal boxes, a TV, a light bulb, fan,
    books, and shower shoes.  (Doc. 76 at 126.)

burdened Plaintiff's ability to possess religious property, and the Court will grant summary judgment to Defendant on the issue of religious property.

### 3.     Assembling with Others for Religious Services

Defendant presents evidence that Native American prisoners in maximum custody can participate in talking circles during recreation time with any other Native Americans at recreation at the same time, but Plaintiff disputes this because under DO 802, prisoners may be validated as STG members if they are observed associating with other STG members.  (Doc. 69 ¶ 70; Doc. 76 ¶ 70.)

Plaintiff's evidence about assembling with others is too vague and conclusory to create a genuine issue of material fact that he is prohibited from assembling with others for religious services.  Plaintiff is already a validated STG member, and it is not clear if he is suggesting that other prisoners in maximum custody will not participate in talking circles with him because, if they are not already, they may also be validated as STG members by participating in a talking circle with Plaintiff or that Plaintiff risks further, unspecified sanctions.  Because Plaintiff has not sufficiently rebutted Defendant's evidence that he can participate in talking circles during recreation time with other Native American prisoners, the evidence fails to create a genuine issue of material fact that Plaintiff has been substantially burdened under either the First Amendment or RLUIPA, and the Court will grant summary judgment to Defendant on the issue of assembling for religious services.

### 4.     Smoke-Generating/Smudging Ceremonies

Defendant argues that ADCRR allows, and Plaintiff's grievance documents confirm, that he can participate in smoke-generating ceremonies such as smudging.  (Doc. 77 at 4.)  But Plaintiff presents evidence that he has had difficulty obtaining the proper accommodations for smoke-generating ceremonies (i.e., burning sage, cedar, sweetgrass, tobacco, and other sacred herbs), and although DO 904 allows Browning Unit prisoners to conduct smoke-generating ceremonies during their regularly scheduled exercise times in an approved exercise area, officers do not have time to escort Plaintiff to an approved exercise area.  (Doc. 76 ¶¶ 142, 144.)

Plaintiff's evidence also includes an Informal Complaint in which he complained that he cannot participate in smudge, and that prison officials have told him if he wants to exercise his religious practices, he "need[s] to renounce." (Doc. 76 at 83.)  In response to the smudging issue, Chaplain Venalonzo said that officers would provide Plaintiff with a lighter to practice his prayers in the recreation field. (*Id*. at 82.)  Plaintiff filed a Grievance stating that even though Venalonzo said officers would provide a lighter, "[t]hat is not what is happening," and officers have told him if he wants to practice his religion, he needs to renounce his STG status and inform on other prisoners. (*Id*. at 80-81.)  The grievance response does not specifically address the smudging or lighter issue, but states that Francisco consulted with the Senior Chaplain and DO 904.3.5, and that "Max custody and detention's security requirements do not allow for the requested services." (*Id*. at 79.) Plaintiff filed a Grievance Appeal, and the response states that the Chaplaincy does not have control over access to a lighter and Plaintiff is "encouraged to work with security for this provision." (*Id*.)

Based on this record, there is a question of fact whether Plaintiff can participate in smudging activities such that this religious practice is substantially burdened.

### a.      First Amendment

Because there is a question of fact, the Court will consider the *Turner* factors to determine whether the apparent restriction on smoke-generating activities is reasonably related to a legitimate governmental interest.

Neither party addresses the *Turner* factors as they relate to each alleged deprivation. Defendant only addresses the *Turner* factors with respect to ADCRR's STG policies, which Defendant argues meet the four *Turner* factors.  Defendant also contends that Plaintiff can participate in smoke-generating/smudging ceremonies while in maximum custody, but Plaintiff has presented evidence that officers have told him that he needs to first renounce, and so he has not been able to participate in smoke-generating/smudging ceremonies. Because of this conflicting evidence and that lack of argument as to this religious practice, there is question of fact whether the burden on Plaintiff's ability to practice smoke-

generating/smudging ceremonies is reasonably related to a legitimate penological interest, and the Court will deny summary judgment to Defendant as to this First Amendment claim.

### b.    RLUIPA

The same finding applies to Plaintiff's RLUIPA claim.  Because Defendant has only argued that Plaintiff is able to participate in smoke-generating/smudging ceremonies and has not demonstrated that the restriction Plaintiff claims furthers a compelling government interest, the Court will deny summary judgment to Defendant as to this RLUIPA claim.

### 5.    Sweat Lodge

Defendant argues that the only restriction on Plaintiff's religious exercise that could amount to a substantial burden is the denial of his ability to attend a sweat lodge while in maximum custody.  (Doc. 68 at 14.)  Given this concession, there is, at minimum, a question of fact whether the inability to participate in a sweat lodge while in maximum custody amounts to a substantial burden on Plaintiff's religious exercise.  *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008) ("We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise.")

### a.    First Amendment

As to the first *Turner* factor, Defendant has presented evidence that because sweat lodges are considered sacred places that correctional officers do not routinely monitor and have been used for making and concealing weapons and exchanging STG information, which can threaten institutional security, Defendant has presented a valid, rational connection between the sweat lodge prohibition and a legitimate governmental interest. This factor weighs in favor of Defendant.

As to the second *Turner* factor, Defendant has presented evidence that Plaintiff has alternative means of exercising his religious rights such as talking circles or dances and smudging ceremonies, the latter of which Plaintiff disputes.  Because there is evidence that Plaintiff can neither participate in sweat lodge nor smudging ceremonies, and it is not clear that talking circles or dances are an adequate substitute, this factor does not favor

Defendants.  Plaintiff does not deny, however, that other religious expressions are available to him or explain why they are not adequate alternatives to sweat lodges or smudging, so this factor also does not favor Plaintiff.

Regarding the third *Turner* factor, the record shows that accommodating Plaintiff's participation in sweat lodge would impact the safety and security of the prison, with Defendant presenting evidence that sweat lodge gatherings can and have been used to exchange STG information and orders and for making and concealing weapons.  Thus, this factor favors Defendant.

The fourth *Turner* factor considers the availability of "obvious, easy alternatives," because "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 90–91.   Plaintiff has not identified an alternative that fully accommodates his right to participate in sweat lodge at a de minimis cost, but he asserts that Captain Young told him his officers can search the sweat lodge grounds without permission, apparently implying this would be a de minimis cost to the prison and resolve the security issue.  But that hearsay statement is ambiguous and does not say officers can enter the sweat lodge during ceremonies when prisoners are present, so it is not clear it would alleviate ADCCR's legitimate security concerns.  Thus, Plaintiff has not pointed to an obvious, easy alternative to the prohibition on sweat lodges in maximum custody.

Because three of the four *Turner* factors favor Defendant, and the fourth factor— whether Plaintiff has alternative means of religious expression does not clearly favor either party, the Court will grant summary judgment to Defendant on Plaintiff's First Amendment claim regarding the sweat lodge.

### b.   RLUIPA

Defendant argues that sweat lodges, by their nature, are different from other religious ceremonies because prisoners cannot be observed when they enter the lodge, and ADCRR has a compelling interest in maintaining the safety and security of the prison.

(Doc. 68 at 14.)  Defendant presents evidence that sweat lodges are sacred and officers do not typically enter them and sweat lodge gatherings have been used to exchange STG information and orders and for making and concealing weapons. (Doc. 69 ¶ 67.)  Defendant presents evidence that prisoners in maximum custody are classified as the most dangerous and require the highest level of security and frequent monitoring.  (*Id.* ¶¶ 47, 50.)  Thus, Defendant argues, prohibiting sweat lodges in maximum security is the least restrictive method of ensuring the safety and security of other prisoners and staff.  (Doc. 68 at 14.)

Plaintiff does not address this specific argument in his Response.

Based on this record, Defendant has shown that ADCRR has a compelling interest in maintaining prison safety and security and that prohibiting sweat lodges in maximum security is the least restrictive means of doing so.  The Court will grant summary judgment to Defendant as to Plaintiff's RLUIPA claim regarding sweat lodges.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 68).

(2)    Defendant's Motion for Summary Judgment (Doc. 68) is **granted in part and denied in part**.   The Motion is **granted** as to all issues except the smoke-generating/smudging issue.

(3)    The remaining claims in this action are Plaintiff's First Amendment and RLUIPA injunctive relief claims regarding the smoke-generating/smudging issue.

(4)    This action is referred by random lot to Magistrate Judge Eric Markovich for the purpose of conducting a settlement conference on this remaining claim for injunctive relief.

….

….

….

….

….

(5)      The parties must jointly contact the chambers of Magistrate Judge Markovich at (520) 205-4600 within **14 days** of the date of this Order to schedule a settlement conference.

Dated this 16th day of January 2024.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge