**WO**                                                              MGD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Johnson, | No. CV-21-02083-PHX-MTL (ESW) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Richard Johnson, who is currently confined in the Arizona State Prison Complex-Eyman, Rynning Unit, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Before the Court is the Second Motion for Summary Judgment by Defendant Ryan Thornell, Director of the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR). (Doc. 99.) Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 101), and he opposes the Motion. (Doc. 108.)

**I.    Background**

In his Complaint, Plaintiff asserts that he is Native American and that societies, including Warrior Societies, "play[] an integral part of Plaintiff's Native Ways/Religious Beliefs." (Doc. 1 at 8.) Plaintiff alleges that ADCRR's designation of Warrior Society as a Security Threat Group (STG) places a substantial burden on Native Americans, discriminates against Native Americans "based upon race and religious belief/Native

Ways," and "inhibits and constrains . . . Plaintiff's[] ability to express [his] Native Ways/Religious Belief." (*Id*. at 9-12.) Plaintiff alleges he has been validated as a Warrior Society member without having committed any disciplinary infractions. As a result, Plaintiff has been placed in maximum custody confinement, where he has less access to rehabilitation programs, no access to "sacred items/religious items," and cannot use a sweat lodge. (*Id*. at 9.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment religious exercise and RLUIPA claims for injunctive relief against Defendant ADCRR Director David Shinn, in his official capacity, and directed the Director to answer the claims.[1] (Doc. 6.) The Court dismissed the remaining Defendant. (*Id.*)

In an Order dated January 16, 2024, the Court granted Defendant Thornell's first Motion for Summary Judgment on all issues except Plaintiff's claim for injunctive relief regarding religious smoke-generating/smudging practices while he is in maximum custody. (Doc. 79.) The Court directed the parties to participate in a settlement conference on this remaining injunctive relief issue. (*Id*.)

The parties were unable to settle this remaining issue, and Defendant sought leave to file a second motion for summary judgment. (Doc. 85.) Defendant argued that an expanded record will show that Plaintiff, who is no longer in maximum custody, was able to smudge and did smudge in maximum custody and that Plaintiff has not, and will not, be able to show a genuine issue of fact from which a reasonable jury (or the Court) could find an ADCRR practice of not allowing Plaintiff, or Native Americans, to smudge while in maximum custody. (Doc. 85 at 1.) Plaintiff did not respond to Defendant's motion for leave to file a second motion for summary judgment, and the Court granted the motion for leave because it appeared the remaining issue may be resolved through an expanded record. (Doc. 89.) On June 26, 2024, Defendant filed his Second Motion for Summary Judgment,

---

[1] Current ADCRR Director Ryan Thornell was automatically substituted for Shinn when Thornell took over the position from Shinn. (Docs. 62, 63.)

which is now fully briefed. (Docs. 99, 108, 110.)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

. . . .

. . . .

### III. Relevant Facts

#### A. Plaintiff's Incarceration and Classification

Plaintiff has been incarcerated by ADCRR since April 2004. (Doc. 100 (Def.'s Statement of Facts) ¶ 6.) Plaintiff was initially classified as medium custody, but over the past ten years, he has been transferred several times to maximum custody because of disciplinary issues. (*Id.* ¶¶ 6, 7.)

In 2014, ADCRR validated Plaintiff as a member of the Warrior Society STG. (*Id.* ¶ 8.) At that time, as part of ADCRR's goal of reducing prison gang violence, the validation of a prisoner as an STG member automatically resulted in the prisoner's placement at ADCRR's maximum custody facility at ASPC–Eyman, Browning Unit. (*Id.* ¶ 9.) In 2021, ADCRR revised its policy, and a prisoner's STG validation no longer mandated the prisoner's placement in maximum custody, and validation was only a factor to be considered in determining custody classification. (*Id.* ¶¶ 10, 11.)

In July 2022, Plaintiff was transferred to close custody, but after officers discovered a homemade handcuff key in Plaintiff's possession, Plaintiff was returned to maximum custody. (*Id.* ¶¶ 13, 14.) Plaintiff disputes the statement that officers found a homemade handcuff key and denies "possessing such contraband." (Doc. 109 at 2 (Pl.'s Statement of Facts) ¶ 13; Doc. 109 at 13 (Pl. Decl.) ¶ 1.) Plaintiff's classification was reviewed again, and on November 8, 2023, Plaintiff was returned to close custody at ASPC-Lewis, Morey Unit.[2] (Doc. 100 ¶ 14.)

#### B. ADCRR's Policies on Smudging

Smudging involves the burning of sage, cedar, sweetgrass and other herbs, and wafting the smoke about as part of a religious ritual for cleansing and prayer. (Doc. 100 ¶ 16.) ADCRR permits smudging unless specifically restricted by the custody level and

---

[2] Plaintiff was still in ASPC-Lewis, Morey Unit, at the time Defendant filed his Motion for Summary Judgment and throughout briefing on the Motion. After briefing was complete, Plaintiff filed a Notice of Change of Address on December 2, 2024, stating he is now housed at ASPC-Eyman, Rynning Unit, but he did not indicate his current classification there. (Doc. 112.)

- 4 -

security of a unit.  (*Id.* ¶ 15.)

ADCRR's Department Order (DO) 109 prohibits smoking or vaping in enclosed areas and buildings, as well as within twenty feet from any building entrance or in areas where smoke could enter buildings through entrances, windows, or other means.  (*Id.* ¶ 17.)  In keeping with DO 109, smudging is not allowed indoors.  (*Id.* ¶ 18.)

Prior to 2021, Browning Unit did not allow prisoners to keep their smudging herbs in their cells out of concern that prisoners might find a way to burn them indoors; prisoners were required to store the herbs and smudging shells, which could be used as weapons, in a sergeant's office.  (*Id.* ¶¶ 19, 20.)  Plaintiff disputes paragraph 19 of Defendant's Statement of Facts "insofar as to his personal knowledge no smudging shell has been used as a weapon" and because Defendant has not provided "indisputable proof but only speculation with no certain knowledge."  (Doc. 109 at 2 ¶ 19.)

Lighters are restricted items for security and health reasons, and prisoners, regardless of custody classification and housing location, may not possess lighters.  (Doc. 100 ¶ 21.)  Prisoners have used lighters to start fires.  (*Id.* ¶ 22.)  The prohibition on lighters makes it less likely prisoners will create incendiary devices that could be used to harm other prisoners and staff.  (*Id.* ¶ 23.)

To accommodate smokers and Native Americans who wish to smudge, ADCRR has installed electronic lighters in the open yards.  (*Id.* ¶ 25.)  For maximum custody prisoners seeking to smudge, correctional officers (COs) provide them with lighters during their outdoor recreation period.  (*Id.* ¶ 26.)  Plaintiff "does not dispute officers are suppose[d] to provide inmates with lighters during their outdoor recreation period."  (Doc. 109 at 3 ¶ 26 (emphasis in original).)

Browning Unit prisoners are provided with at least 2.5 hours of recreation time a day.  (Doc. 100 ¶ 27.)  Maximum custody prisoners in Browning Unit are provided recreation within security enclosures measuring 10 x 10 feet for individual recreation time and 20 x 40 or 50 x 90-foot enclosures for group recreation.  (*Id.* ¶ 28.)

Until 2020 or 2021, the chaplain would keep the smudging lighters in an office.  (*Id.*

- 5 -

¶ 29.) Lighters were also kept in the shift commanders' office and in the control rooms, but this practice ended a year or two ago because officers were forgetting to return the lighters. (*Id.* ¶ 30.) For the last year or two, lighters have been included in the equipment carts that COs bring to recreation, and a lighter or two is still usually kept in the shift commander's office. (*Id.* ¶ 31.) Plaintiff disputes paragraph 31 because he has never seen any lighters or any equipment carts while being turned out for recreation at Browning Unit. (Doc. 109 at 3 ¶ 31.) COs would sometimes provide a prisoner with a lighter of their own or from a fellow officer or COs can go to the shift commander's office to retrieve one. (Doc. 100 ¶¶ 32, 33.)

If they are not in one of the group enclosures, prisoners seeking to organize a communal smudging activity are required to make a request through the chaplain. (*Id.* ¶ 34.) Plaintiff disputes paragraph 34, asserting that he "has requested a communal religious activity before but was told that due to his status as an STG inmate and being in maximum security, [his] request posed a security risk and was denied." (Doc. 109 at 3 ¶ 34.)

COs assigned to recreation are trained in their duties and instructed on the right of authorized Native Americans to smudge during their recreation time. (Doc. 100 ¶ 35.)

Major Christina Brewer, who was a captain security chief at Browning Unit from December 2019 through July 2022, acknowledges that Browning Unit had a problem with some officers not following the policy of allowing Native American prisoners to smudge prior to 2021. (*Id.* ¶ 37.) Therefore, to address the problem, Major Brewer issued a memorandum on January 31, 2021, affirming that Native American prisoners were allowed to smudge during recreation. (*Id.* ¶¶ 38, 39.) The memorandum directed officers to retrieve the prisoners' religious materials and provide them with a lighter to ignite their herbs. (*Id.* ¶ 39.) Plaintiff asserts that "officers prohibited him to exercise his religious practices during December 2019 through July 2022 on a consistent basis." (Doc. 109 at 4 ¶ 37.)

To accommodate Native American prisoners' requests to smudge, the Chaplaincy purchased lighters that were kept with the prisoners' smudging materials stored in the Chaplaincy office, and Brewer had extra lighters placed in the yard office, so officers had

access to them in case they were needed during recreation. (Doc. 100 ¶¶ 40, 41.) Plaintiff asserts he does not have enough information to dispute these facts but if the chaplaincy purchased lighters for religious purposes, he "is unaware of this gesture," and he is unaware that Major Brewer had extra lighters placed in the yard office for religious purposes. (Doc. 109 at 4 ¶¶ 40, 41.)

### C. Plaintiff's Smudging Requests and Grievances

Defendant asserts that ADCRR officials, including Deputy Security Operations Manager Ronald Towles and Captain Richard Michael Johnson, have repeatedly affirmed Plaintiff's right to smudge, and COs have provided Plaintiff with the opportunity to smudge while at recreation. (Doc. 100 ¶ 36.) Plaintiff asserts he "does not dispute [paragraph 36] insofar that prison officials do affirm Plaintiff's right to smudge, but in practice is another matter." (Doc. 109 at 3 ¶ 36.)

On November 5, 2019, while in the Browning Unit, Plaintiff began the grievance process in Case 20-013512, complaining that Chaplain Childs said Plaintiff could only smudge in the 10 x 10 rec cages and not in the "chute rec.," that he had to store his smudging material with the chaplain, who would provide a lighter when needed, and that, for over a month and a half, recreation had either been canceled or the chaplain was not around to access Plaintiff's smudging materials. (Doc. 76 at 71.) The responses informed Plaintiff that he was on a list maintained by Chaplain Willis of prisoners approved to smudge, that Plaintiff needed to notify the chaplain when he wanted to smudge, that smudging materials would be secured in the lieutenant's office, and that the chaplain had supplied the security lieutenant with lighters and prisoners' smudging materials. (*Id*. at 69, 70, 187, 189.)

On September 13, 2020, while in ASPC-Eyman, SMU II, Plaintiff began the grievance process in Case 20-022699, in which he complained that the chaplain told him that the deputy warden said Plaintiff cannot smudge and so no lighter would be provided to Plaintiff; Plaintiff asked why he was not being allowed to smudge. (*Id*. at 185.) Plaintiff later clarified in his Grievance that he was only allowed to smudge in the "interactive rec.

cages," not "chute rec.," and, due to Covid, prisoners were not being sent to the interactive rec cages. (*Id.* at 184.) The deputy warden of Browning Unit responded that smudging was being offered in the chute recreation area and 10 x 10 recreation areas. (*Id.* at 181.)

On January 27, 2021, while in Browning Unit, Plaintiff began the grievance process in Case 21-026141, in which he complained that Chaplain Willis was requiring Plaintiff to fill out an additional form to obtain a smudging shell because shells were now classified as a security threat item. (*Id.* at 168-69, 171-72.) Plaintiff wrote in his Grievance that the additional form was not an institutional/departmental official form, and it required him to acknowledge that smudging shells are a security threat, which Plaintiff refused to do because smudging shells are religious items, and he would not acknowledge they are anything else. (*Id.* at 166.) The Grievance Response said smudging shells would be considered on an individual basis upon written request and Plaintiff was to submit the necessary documentation to the chaplain for his request to be considered. (*Id.* at 167.)

On March 7, 2021, while in APSC-Eyman, SMU II, Plaintiff began the grievance process in Case 21-028587, in which he complained that on March 5, 2021, a lieutenant instructed the rec crew that Plaintiff was prohibited from smudging, even after Plaintiff showed officers a grievance response from Deputy Warden Scott stating that smudging is allowed in the 10 x 10 rec cages. (*Id.* at 163.) On April 7, 2021, CO IV Altigieri responded that she had previously informed Plaintiff of dates on which he had smudged, that Plaintiff declined her offer of a lighter for smudging on March 4, 2021, and that Plaintiff did not request to smudge on March 26, 2021, when Altigieri gave the lighter to other Native Americans for smudging. (*Id.* at 162.) Altigieri also discussed the ways Plaintiff could obtain a lighter for smudging, such as sending her an inmate letter, asking the CO to call her on the radio or phone, or the CO could go to Altigieri's office or the control room to get a lighter. (*Id.*) Plaintiff filed a Grievance and Grievance Appeal on the issue of being denied smudging on March 4 or 5, 2021 and asking that officers be instructed on "Native Ways/religious beliefs" and to quit providing "excuse after excuse."[3] (*Id.* at 158, 160.) In

---

[3] Plaintiff stated in his Grievance Appeal that he had the wrong date in his Grievance

- 8 -

response to his Grievance, the Deputy Warden informed Plaintiff that officers were not prohibiting Plaintiff in any way from practicing his native/religious beliefs, but that Plaintiff refused to follow the proper steps to obtain a shell for smudging. (*Id.* at 159.) In response to Plaintiff's Grievance Appeal, the Director's office informed Plaintiff that the chaplain is available during Thursday recreation to offer approved inmates the opportunity to smudge, that the unit CO IV also made herself available to inmates needing a lighter to smudge, and that Plaintiff failed to substantiate his claim that staff were discriminating against him. (*Id.* at 157.)

On April 13, 2021, while in the Browning Unit, Plaintiff sent a "Letter of Concern" to the ADCRR Director and Assistant Director about the certification and annual review of the Warrior Society STG, which Plaintiff said made the Warrior Society the equivalent of a terrorist organization, was highly prejudicial, and placed a substantial burden on Native Americans. (*Id.* at 129.) In his letter, Plaintiff explained the importance of maintaining Native Ways/Religious Beliefs, various practices, including smudging, and their purposes. (*Id.* at 129-133.) The response to this letter from Warden Hensley states that ADCRR has not classified the Warrior Society STG as the equivalent of a terrorist organization, but the Warrior Society has met the criteria of an STG under DO 806 for the past 25 years with documented instances of criminal behavior such as drug transactions, extortion and murders. (*Id.* at 128.)

On May 11, 2021, while in the Browning Unit, Plaintiff began the grievance process in Case 21-030447, in which he complained that he was not ready for recreation turn out on May 10, 2021, and was not given standby. (*Id.* at 180.) Plaintiff also wrote about problems he had obtaining a lighter for smudging from CO Wilson, who told Plaintiff he was too busy to get a lighter or that Plaintiff did not need one. (*Id.*) The grievance response said a Town Hall meeting was held on July 14, 2021, and the issue of recreation times and standby notifications was discussed. (*Id.* at 177.)

On May 24, 2022, while in the Browning Unit, Plaintiff began the grievance process

---

and he was actually denied smudging on March 4, 2021. (Doc. 76 at 158.)

- 9 -

in Case 22-041521, in which he complained that for over a month, new officers had been refusing to provide a lighter for smudging or that the lighters did not work. (*Id*. at 143.) The response states that the concern was forwarded to Capt. Brewer but there is nothing else in the response addressing Plaintiff's complaint. (*See id*. at 142.)

On January 27, 2023, while in the ASPC-Winslow Central Detention Unit (CDU), Plaintiff began the grievance process in Case 23-051425, in which he complained that he was not allowed to smudge while in the CDU. (*Id*. at 141.) The response states that Chaplain Humphreys went to CDU on January 31, 2023, to conduct smudging with Plaintiff and that Plaintiff should submit an inmate letter with any religious needs so they can be conducted and scheduled. (*Id*. at 140.)

On February 27, 2023, while in the Browning Unit, Plaintiff began the grievance process in Case 23-052228, in which he complained that he requested a lighter for smudging and officers told him it was not permitted in maximum custody and that Plaintiff needed to renounce if he wanted to exercise his religious practices. (Doc. 76 at 83.) The response states that officers will provide Plaintiff with a lighter in the recreation field when requested from Monday to Friday only. (*Id*. at 82.) In his Grievance, Plaintiff said, "that is not what is happening" and he has been told in the past that if he wants to exercise his religion unhindered, he needed to renounce his STG status and inform on other prisoners. (*Id*. at 81.) The response to Plaintiff's second-level appeal of this grievance states that the shift commander will provide a lighter to staff on weekdays to allow the practice of smudging. (*Id*. at 73.)

On June 21, 2023, while in Browning Unit, Plaintiff wrote in an Informal Complaint that CO II Holmes told him he was too busy to pull Plaintiff out for recreation or get him a lighter. (*Id*. at 85.) The Court did not locate a response to this Informal Complaint.

Defendant asserts that CO IV Altigieri frequently visited the recreational enclosures, observed Native American prisoners smudging, and offered her personal lighter when requested. (Doc. 100 ¶ 44.) Plaintiff disputes this fact because he does not recall Altigieri frequently visiting the recreational enclosures, and Plaintiff says he will reverse his dispute

if Defendant can provide security footage verifying this fact. (Doc. 109 at 4 ¶ 44.)

Sgt. Robert Comeau, who supervised recreation at Browning Unit from 2018 through December 2023, never refused to provide a lighter to a Native American prisoner, although there were times when a prisoner might have to wait until the recreation turnout was completed. (Doc. 100 ¶ 45.) Sgt. Comeau has watched Plaintiff obtain his smudging materials from his religious box and has provided Plaintiff with a lighter or observed other officers providing Plaintiff with a lighter on numerous occasions. (*Id.* ¶ 46.)

CO Evan Baker, assigned to Browning Unit while Plaintiff was there, does not recall any time that he or another member of the recreation staff refused to provide a lighter, and most officers understood that refusing to do so could get them in trouble. (*Id*. ¶¶ 47, 48.) Baker personally provided or obtained a lighter for Plaintiff on numerous occasions. (*Id.* ¶ 49.)

Plaintiff was also able to smudge after he was transferred to ASPC-Lewis. (*Id.* ¶ 50.) Close custody Native American prisoners are permitted to smudge during their recreation time, either individually or during group ceremonies. (*Id.* ¶ 51.) The chaplain's office keeps records of the talking circle ceremonies, and those records show that Plaintiff participated in a dozen talking circles where he smudged between his arrival at APSC-Lewis, Morey Unit, on November 8, 2023, and the end of May 2024. (*Id.* ¶ 52.) ASPC-Lewis Chaplain Sean Smith asserts that Plaintiff participated in Talking Circle Services with smudging on November 14 and 29, 2023; December 13, 19, and 26, 2023; January 8, 22, and 29, 2024; February 28, 2024; March 4 and 18, 2024; and April 15, 2024.[4] (Doc. 100-1 at 71 (Smith Decl.) ¶ 12.) Smith asserts that Plaintiff attended Talking Circle Services on three dates in April 2024 and two dates in May 2024, but the prisoners chose not to smudge during those services. (*Id.* ¶ 13.)

. . . .

. . . .

---

[4] Defendant filed his Motion for Summary Judgment on June 26, 2024, which explains why there are no dates listed in the second half of 2024.

- 11 -

## IV. Religious Exercise Legal Standards

### A. First Amendment

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d 884-85 (noting the Supreme Court's disapproval of the centrality test and finding that the sincerity test in *Malik* determines whether the Free Exercise Clause applies).

If the prisoner makes this initial showing, the prisoner must then establish that prison officials substantially burdened the prisoner's religious practice by preventing the prisoner from engaging in conduct which the prisoner sincerely believes is consistent with his or her faith. *Shakur*, 514 F.3d at 884-85. A regulation that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). This determination requires analysis of four prongs: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to prisoners; (3) the impact accommodation of the right will have on guards and other prisoners, and on the allocation of prison resources; and (4) the absence of ready alternatives. *Id.* at 90.

### B. RLUIPA

Under RLUIPA, a government may not impose a substantial burden on the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2); *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

RLUIPA requires a prisoner to show that the relevant exercise of religion is grounded in a sincerely held religious belief. *Holt v. Hobbs*, 135 S. Ct. 853, 859, 862

(2015). Next, the prisoner bears the burden of establishing that a prison policy constitutes a substantial burden on that exercise of religion. *Id.*; *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). RLUIPA provides greater protection than the First Amendment's alternative means test. *Holt*, 135 S. Ct. at 862.

If the prisoner satisfies these two showings, the burden shifts to the government to prove that the substantial burden on the prisoner's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Warsoldier*, 418 F.3d at 995.

**V.     Discussion**

There is no dispute that Plaintiff's religious exercise, including smudging, is grounded in a sincerely held religious belief and not some other motivation. Therefore, the Court's analysis focuses on whether Defendant has substantially burdened Plaintiff's religious exercise and, if so, whether the burden is reasonably related to a legitimate penological interest under the First Amendment and furthers a compelling government interest under RLUIPA.[5]

In the First Amendment context, a substantial burden exists "where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981). In the RLUIPA context, a substantial burden is one that is "'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of*

---

[5] The Court notes, however, that Plaintiff appears to frame the religious exercise right at issue as unfettered access to smudging. That is, there is no dispute that Plaintiff has a right to smudging. Plaintiff's grievance documents, instead, reflect challenges to administrative requirements prior to smudging or challenges to occasions where circumstances prevented smudging.

The Court does not view the right so narrowly. Nor does it constitute a substantial burden on Plaintiff's religious exercise to have access to smudging outdoors or on a schedule that is based on the availability of resources.

- 13 -

1 *Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). To substantially burden the practice of an individual's religion, the interference must be more than an isolated incident or short-term occurrence. *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998).

Defendant argues that the only policy and practice at issue is Plaintiff's ability to smudge while he is in maximum custody. (Doc. 99 at 13.) Defendant contends that although Plaintiff has alleged that various, mostly unnamed, officers have refused to let him smudge during recreation, have not provided him with a lighter, or said they were too busy to do so, ADCRR's policy clearly provides Plaintiff with the right to smudge, which supervisors have affirmed is the Department's recognized practice, and several COs have testified that Plaintiff has been able to smudge. (*Id*.) Defendant also notes that Plaintiff's claim for prospective relief became moot when Plaintiff was transferred on November 8, 2023, to a close custody unit at ASPC-Lewis, but jurisdiction may still exist unless subsequent events make it absolutely clear that allegedly wrongful behavior could not reasonably be expected to recur. (*Id.* n.5.)

Plaintiff responds there are genuine issues of material fact due to the "continuance of officers refusing to allow [him] to exercise his religious practices and expressions" and that "suggesting that a handful of officers were not allowing Plaintiff to exercise his religious practices and expressions should not be enough for this Court to conclude that there is no genuine issue of material fact." (Doc. 108 at 2-3.) Plaintiff filed his response on September 23, 2024, and asserts that as recently as February through September 2023, he never saw any lighters brought to recreation as part of the equipment. (Doc. 108 at 6.) But Plaintiff's statement that he did not see any lighters does not create an issue of fact. Plaintiff does not have personal knowledge of whether lighters were brought and went unseen.

Nevertheless, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects." *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *Bayer v. Neiman Marcus Grp., Inc*., 861 F.3d 853, 864

1  (9th Cir. 2017) ("A request for injunctive relief remains live only so long as there is some
2  present harm left to enjoin.") (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497,
3  1502 (D.C. Cir. 1995)).  An exception to the mootness doctrine exists if a violation is
4  "capable of repetition, yet evading review."  *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir.
5  1995) (citations omitted).  This exception applies when "(1) the challenged action is too
6  short in duration to be fully litigated prior to its expiration and (2) there is a reasonable
7  expectation that the injury will occur again."  *Id.*

8  Here, there is evidence that Plaintiff has been in and out of maximum custody, where
9  his complaints about the ability to smudge arose.  Therefore, this appears to be a case where
10 the exception to the mootness doctrine may apply, because Plaintiff may be subject to the
11 conditions in maximum custody in the future, and the Court may consider Plaintiff's
12 request for injunctive relief.

13 Plaintiff's evidence shows that on June 21, 2023, he submitted an Informal
14 Complaint asserting that CO II Holmes told him he was too busy to pull Plaintiff out for
15 recreation or get him a lighter.  (Doc. 76 at 85.)  This is the most recent date for which
16 Plaintiff indicates he was unable to smudge while in maximum custody.  Plaintiff was
17 transferred out of maximum custody on November 8, 2023, and it is unknown if Plaintiff
18 is currently in maximum custody in the Rynning Unit.  Even if Plaintiff is in or returns to
19 maximum custody, Plaintiff does not dispute that ADCRR's policy permits prisoners in
20 maximum custody to smudge during recreation time and that maximum custody prisoners
21 in Browning Unit are provided at least 2.5 hours of recreation time a day.  The question,
22 then, is whether in maximum custody the practice has been to prohibit Plaintiff from
23 smudging such that it creates a substantial burden on his religious practice.  Unfortunately,
24 Plaintiff does not provide evidence of how often his religious practice requires him to
25 smudge, and there is no evidence of how often Plaintiff has been prevented from smudging
26 other than a few occasions over a four-year period ending in mid-2023.

27 Plaintiff's evidence of approximately 9 Informal Complaints or Formal Grievances
28 filed between November 2019 and June 2023 provides few details on when Plaintiff

1  actually requested to smudge and was denied. Several of Plaintiff's documents either
2  complained about the designated location for smudging (in the interactive rec cages vs. the
3  chute rec) or being required to fill out a form to obtain a smudging shell or the designation
4  of the Warrior Society as an STG. (*See* Doc. 76 at 71, 129-133, 166-69, 171-72, 184-85.)
5  As stated, those complaints only support a claim for unfettered access to smudging. There
6  is no basis to conclude that requiring smudging to occur outside in secure locations
7  constitutes a substantial burden on Plaintiff's religious exercise.

8  Ultimately, only a few grievance documents provided specific dates when recreation
9  was canceled, or someone was unable or unwilling to provide Plaintiff smudging materials
10 (March 5, 2021, May 11, 2021, January 27, 2023, June 21, 2023). (*Id*. at 85, 141, 163,
11 180.)

12 Other grievance documents during those four years vaguely asserted that recreation
13 was canceled for a period of time (in 2019 and again in 2020 due to the COVID-19
14 pandemic), the chaplain not being available to get smudging materials (in 2019), new
15 officers not following policy (in 2022), lighters not working (in 2022), or officers telling
16 Plaintiff he needed to renounce (in 2023). (Doc. 76 at 71, 81, 83, 184.) Absent additional
17 facts specifying when and whether Plaintiff requested to smudge and was precluded from
18 smudging, this evidence is too vague and conclusory to infer Plaintiff suffered a substantial
19 burden to his religious practice or that he will be subject to those same conditions in the
20 future such that he is entitled to injunctive relief. *See Soremekun v. Thrifty Payless, Inc*.,
21 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and
22 moving papers is insufficient to raise genuine issues of fact and defeat summary
23 judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory,
24 self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to
25 create a genuine issue of material fact").

26 Moreover, the responses to Plaintiff's grievances affirmed Plaintiff did have the
27 right to smudge during recreation time, or that Plaintiff did, in fact, smudge, was on a list
28 of prisoners allowed to smudge, and the steps Plaintiff needed to take to smudge. (*See*

Doc. 76 at 65, 68, 69, 73, 82, 140, 157, 159, 164, 181, 187, 189.)  In addition, to address the problem of some officers not following the policy of allowing Native American prisoners to smudge, Major Brewer sent a memorandum to security officers on January 31, 2021, informing them that prisoners had a right to smudge during recreation and directing officers to retrieve the prisoners' religious materials and provide them with a lighter to ignite their herbs.  (DSOF ¶¶ 37-39.)

The most recent evidence of Plaintiff not being able to smudge occurred in Browning Unit in June 2023, when Plaintiff says CO Holmes was too busy to take Plaintiff to recreation or get him a lighter.  Although Plaintiff asserts in his Response that as recently as February through September 2023, he never saw any lighters brought to recreation as part of the equipment, Plaintiff does not say that lighters were not available upon request. Finally, there is simply insufficient evidence showing how often Plaintiff believes he needs to smudge and how often he has been denied the ability to smudge to conclude that the incidents reflected in his grievance documents over a four-year period were anything more than isolated incidents or short-term occurrences or that there was a policy, practice or custom that prevents him from smudging while in maximum custody.  *Canell*, 143 F.3d at 1215 (substantial burden must be more than an isolated incident or short-term occurrence).

Based on this record, no reasonable jury could conclude that even if Plaintiff is returned to maximum custody, he faces substantial pressure to modify his behavior and violate his beliefs, and the Court will grant summary judgment to Defendant on Plaintiff's remaining claim related to smudging.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 99).

(2) Defendants' Motion for Summary Judgment (Doc. 99) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 10th day of January, 2025.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge